UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

GEORGE MESSIHA,

               Plaintiff,

       v.

CITRIX SYSTEMS, INC., ROBERT M.
CALDERONI, NANCI E. CALDWELL,
MURRAY J. DEMO, THOMAS E. HOGAN,
MOIRA A. KILCOYNE, ROBERT E.
KNOWLING, JR., PETER J. SACRIPANTI,
and J. DONALD SHERMAN.

               Defendants.

Case No. 1:22-cv-02094

**COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT
OF 1934**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff George Messiha ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

<u>**NATURE OF THE ACTION**</u>

1.     This action is brought by Plaintiff against Citrix Systems, Inc. ("Citrix" or the "Company") and the members of the Company's board of directors ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of Citrix stockholders to, *inter alia*, vote in favor of a merger transaction

("Merger") pursuant to which Citrix will become a wholly-owned subsidiary of Picard Parent, Inc. ("Picard"), an entity formed by TIBCO Software, Inc. ("TIBCO"), in exchange for payment of $104.00 per share in cash to Citrix's stockholders ("Citrix Stockholders") by Vista Equity Partners ("Vista") and an affiliate of Elliott Investment Management L.P. ("Elliott").

2.      On January 31, 2022, Citrix announced that the Board had approved the sale of the Company to Vista and Elliott for $104.00 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3.      On March 3, 2022, Defendants authorized the filing of a false and misleading preliminary proxy on Schedule 14A ("Preliminary Proxy" or "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, with the aim of soliciting Citrix stockholders to vote for the Merger and certain related proposals.

4.      The Preliminary Proxy contains material misrepresentations and omissions including, among other things (i) material omissions concerning extensive prior business relationships between Elliott and Defendant Robert M. Calderoni (who has served as Chairman of the Board since July 2015, and was appointed Interim President and Chief Executive Officer of Citrix in October 2021); (ii) material omissions concerning the enormous progress made by Citrix in 2021 transitioning its customers to the cloud, and substantial growth in 2021 of recurring cloud-based revenue (which Defendant Calderoni publicly characterized as the "best metric" to measure the success of Citrix's business); (iii) false statements of opinion painting an unduly pessimistic picture of Citrix's prospects (by ignoring the rapid growth in cloud-based revenue); and (iv) a materially false and misleading fairness opinion.

5.      The above and other material misrepresentations and omissions render the Preliminary Proxy false and misleading in violation of the above-referenced Exchange Act

provisions and Rule 14a-9.

6.     The Preliminary Proxy advises that a special meeting of Citrix Stockholders will be held to vote on the Merger and certain related proposals ("Stockholder Vote"). The violations referenced above must be cured in advance of the Stockholder Vote to enable Citrix stockholders to make an informed decision concerning whether or not to vote in favor of the Merger and related proposals. Therefore, Plaintiff seeks to enjoin the Defendant from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by himself and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

8.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant

that authorizes suit under federal-question jurisdiction and nationwide service of process . . .
Second Circuit has consistently held that the minimum-contacts test in such circumstances looks
to contacts with the entire United States rather than with the forum state.").

9.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business
in this District. In particular, Citrix's common stock trades under the ticker "CTXS" on NASDAQ,
which is headquartered in this District, and the false and misleading Preliminary Proxy was filed
with the SEC, which is headquartered in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144
(2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction
constituting the alleged violation occurred in the Southern District of New York); *United States v.
Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution
appropriate in District).

## PARTIES

10.     Plaintiff is, and has been at all relevant times, a continuous stockholder of Citrix
common stock.

11.     Defendant Citrix is a Delaware corporation with its principal executive offices
located at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

12.     Defendant Robert M. Calderoni ("Calderoni") has served as Chairman of the Board
of Citrix since July 2015, and was appointed Interim President and Chief Executive Officer of
Citrix in October 2021.

13.     Defendant Nanci E. Caldwell ("Caldwell") has served as a director of Citrix since
July 2008.

14.     Defendant Murray J. Demo ("Demo") has served as a director of Citrix since
February 2005.

15.     Defendant Thomas E. Hogan ("Hogan") has served as a director of Citrix since December 2018.

16.     Defendant Moira A. Kilcoyne ("Kilcoyne") has served as a director of Citrix since June 2018.

17.     Defendant Robert E. Knowling, Jr. has served as a director of Citrix since October 2020.

18.     Defendant Peter J. Sacripanti has served as a director of Citrix since December 2015.

19.     Defendant J. Donald Sherman has served as a director of Citrix since March 2020.

20.     Defendants identified in paragraphs 12 to 19 are collectively referred to herein as the "Individual Defendants," and together with Citrix, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Cloud-Based Computing

21.     Cloud-based computing solutions—also known "software as a service," "SaaS," or "subscription software"—refers to software applications, storage, and other computing resources that users access on their desktop from remote computers via an Internet connection. The model is analogous to homes and businesses accessing electricity on their premises supplied by remote power plants.

22.     ARR is an acronym for Annual Recurring Revenue, which is a key metric used to measure the success of companies selling SaaS and other subscription-based solutions residing in the cloud.

### Citrix's Transition to Cloud-Based Solutions

23.     Citrix delivers digital workspace solutions that provide secure remote access to

work resources such as data and software applications and support collaboration across distributed work environments.

24.     In recent years, because of the growing popularity of cloud-based computing solutions, Citrix has aggressively sought to migrate its workspace solutions to the cloud. As the Preliminary Proxy states: "Over the past several years, Citrix has been transitioning to a subscription-based, or software-as-a-service ("SaaS") business model, while also expanding its cloud-based solutions in an effort to move customers from on-premise solutions to the cloud."

25.     To measure the success of its transition to cloud-based solutions, Citrix has created a metric called "SaaS ARR," which it defines as "the contracted recurring value of all cloud subscriptions normalized to a one-year period."[1] As discussed further below, Citrix's SaaS ARR experienced enormous growth in 2021 (which the Preliminary Proxy fails to disclose to Citrix stockholders).

**Elliott's Prior Relationship With Defendants**

26.     On June 11, 2015, Elliott wrote a letter to the then Citrix CEO and Board advocating for broad operational improvements at the Company, and disclosing that Elliott had acquired Citrix common stock and derivatives providing Elliott with aggregate economic exposure comparable to an interest in approximately 7.1% of Citrix common stock (later rising to 7.5%).

27.     On July 28, 2015, Citrix announced that it had entered into a cooperation agreement with Elliott pursuant to which it, *inter alia*, agreed to appoint Mr. Jesse Cohn ("Cohn"), a senior Elliott portfolio manager, to the Board, and commence a search for an additional independent Board member mutually agreeable to Citrix and Elliott.

28.     The same day, Citrix also announced that (i) Defendant Calderoni would assume

---

[1] All emphasis is added unless otherwise noted.

the role of Chairman of the Board, and (ii) the Board had formed an operations committee ("Operations Committee") to work closely with Company management on a comprehensive operational review focused on improving Citrix's margins, profitability and capital structure. Citrix advised that the Operations Committee would be led by Defendant Calderoni and be comprised of four directors, including Defendant Calderoni, Cohn, and the new independent director to be mutually agreed upon by Citrix and Elliott.

29.     Qatalyst Partners ("Qatalyst") served as a financial advisor to Citrix in connection with the foregoing developments.

30.     On October 21, 2015, Citrix named Defendant Calderoni interim President and CEO of Citrix. Defendant Calderoni previously served as a director of Juniper Networks, Inc. ("Juniper") where he worked with Elliott after Elliott reached an agreement with Juniper in February 2014 to obtain two seats on Juniper's board of directors and implement a plan to improve operations. Defendant Calderoni also served as a senior advisor to Silver Lake Partners, a private equity firm that announced in October 2015 it would participate in the $67 billion purchase by Dell Computers of EMC Corp., in which Elliott held a 2.2% stake and which Elliott had been pressuring since October 2014 to spin off assets.

31.     In Q1 2020, Elliott exited its position in Citrix, and on April 16, 2020, Citrix announced that Cohn would be leaving the Board. The press release announcing Cohn's departure, quoted Defendant Calderoni in his capacity as Chairman of the Board:

> We want to thank Jesse for his dedicated service to the board. His candor, insights and partnership have been valuable and appreciated as the company was executing a significant shift in our strategy, operations and business model. Today, with leadership from the board and executive team, and execution by our 8,500 plus employees, Citrix is stronger and more valuable than ever, and I want to thank Jesse for his many contributions to our success over the past five years.

32.     The Preliminary Proxy does not disclose the full extent of the past business

relationships between Defendant Calderoni and Elliott, as described above.

**Citrix's Acquisition of Wrike from Vista**

33. On January 16, 2021, consistent with its new focus on cloud-based solutions, Citrix announced it had agreed to pay $2.5 billion in cash to Vista to acquire Wrike, Inc. ("Wrike"), a provider of cloud-based collaborative work management programs.

34. According to the press release announcing the acquisition, Wrike was expected to grow its SaaS ARR by 30 percent to between $180 million and $190 million in 2021. Citrix thus paid Vista approximately 12.1x *expected* 2021 SaaS ARR for Wrike.

**Citrix's Q1 2021 Results**

35. On April 29, 2021, Citrix announced its Q1 2021 results. In a letter to shareholders ("Q1 2021 Letter"), then CEO David Henshall ("Henshall") wrote concerning Citrix's transition of customers to cloud-based solutions that "[o]ur first quarter results ***reflect accelerated momentum in our cloud transition*** with more of our installed base moving to the cloud, driving an increased mix shift towards SaaS and acceleration of SaaS ARR." He then highlighted the following successes:

- Excluding the impact of Wrike, first quarter SaaS ARR accelerated sequentially to $793 million, representing 43% year-over-year growth. ***Inclusive of Wrike's contribution, total SaaS ARR was $943 million, up 70% year-over-year***, and total Subscription ARR was $1.51 billion, up 81% year-over-year.

- The number of Citrix Cloud Paid Subscribers increased 34% year-of-year, to over 10.3 million.

**Citrix's Q2 2021 Results**

36. On July 29, 2021, Citrix announced its Q2 2021 results. In a letter to shareholders ("Q2 2021 Letter"), Henshall wrote that despite revenue challenges, Citrix's transition of customers to cloud-based solutions was progressing strongly:

"Our second quarter results reflect continued positive momentum in our business model transition *with accelerating SaaS ARR, strong growth in Citrix Cloud Paid Subscribers and a higher-than-expected mix of SaaS bookings as a percentage of total subscription bookings*. Reported revenue, however, reflects the challenge associated with transitioning the business to SaaS and the need to evolve our sales strategy to deliver more predictable results.

Key takeaways [regarding the SaaS business] include:

- *SaaS ARR of more than $1B, up 74% year-over-year*. Excluding Wrike, second quarter SaaS ARR accelerated for the third consecutive quarter to $868 million, *up 47% year-over-year*.

- The number of Citrix Cloud Paid Subscribers *increased 52% year-over-year*, to 11.4 million with growth accelerating from 34% year-over-year in Q1 2021.

- SaaS mix of subscription bookings was 63%, compared to guidance of 50-55% . . . .

* * *

*As we progress through this transition, we continue to believe that <u>SaaS ARR is the best way to measure the progress we are making in transitioning our business to the cloud</u>.* With year-over-year growth accelerating for the third consecutive quarter, both inclusive and exclusive of Wrike since the close of the acquisition, strong SaaS ARR growth demonstrates our focus on transitioning our installed base."

## Citrix's Q3 2021 Results

37.     On November 4, 2021, Citrix announced its Q3 2021 results. In a letter to shareholders ("Q3 2021 Letter"), Defendant Calderoni, wrote concerning Citrix's transition of customers to cloud-based solutions:

*In the third quarter of 2021, Citrix made significant progress on its transition to the cloud.* This quarter, Total ARR grew organically 13% year-over-year, excluding Wrike, despite tough comparisons due to strong demand tailwinds from COVID-related purchases in the prior year. Total ARR also grew faster year-over-year than the prior quarter, demonstrating a continued acceleration of our subscription transition. SaaS ARR is now greater than $1 billion. *Organic SaaS ARR grew 48% year-over-year, and the third quarter was the fourth consecutive quarter of accelerating organic SaaS ARR growth – a clear sign that our SaaS offerings are resonating with customers*.

9

Key takeaways include:

- ***SaaS ARR of $1.1 billion***, ***up 75% year-over-year***. Excluding Wrike, third quarter SaaS ARR accelerated to $934 million, ***up 48% year-over-year***.

- The number of Citrix Cloud Paid Subscribers ***increased 47% year-over-year***, to 12.2 million.

- ***SaaS mix of subscription bookings was 64%***, towards the high-end of our guidance range of 60-65% and up from 48% at the beginning of the year.

38.     Defendant Calderoni added:

***Despite achieving more than $1 billion in SaaS ARR in the third quarter of 2021, we are still in the early innings of our cloud transition with less than 15% of our current installed base having transitioned to cloud products. This continues to represent an enormous opportunity and provides a strong tailwind to support our SaaS ARR growth for year***s. Customers making the transition are realizing greater value as they shift to our cloud solutions, and we consistently see an uplift in price that exceeds our target 33% premium as customers derive added value, greater agility, and reduced total cost of ownership (TCO) as they migrate to SaaS from our on-premise perpetual Workspace offerings. ***Finally, the revenue headwinds from declining perpetual licenses are now largely behind us in our Workspace business as we reach the anniversary of the end of broad availability of perpetual Citrix Workspace licenses. We believe Total ARR is the best metric to measure the underlying health of our business. Over time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR***.

**Citrix's Q4 2021 Results**

39.     On January 31, 2022, Citrix announced its Q4 2021 and FY 2021 results, but did not issue a shareholder letter because it simultaneously announced the Merger. Despite showing a 1% decrease in overall revenue in 2021 from 2020, the FY 2021 results showed substantial growth in subscription revenue, i.e., reaching approximately $1.6 billion in 2021 versus $1.1 billion in 2020. The nearly 50% growth in subscription revenue in 2021 confirmed that Citrix had made enormous progress in 2021 in transitioning to a cloud-based model. As noted above, SaaS ARR had constituted an increasing percentage of subscription revenue, reaching 64% of such revenue in Q3 2021, and thus the FY 2021 results also reflected the tremendous growth in SaaS ARR.

10

40.     Yet, despite the focus on the enormous growth in SaaS ARR in the Q1, Q2 and Q3 2021 Letters, the January 31, 2022 announcement of Citrix's Q4 2021 and FY 2021 results makes no explicit mention of SaaS ARR.

**Citrix Sells Itself to Elliott and Vista at an Unfair Price**

41.     On August 23, 2021, Cohn contacted Defendant Calderoni (then non-executive Chairman of the Board) and Henshall (then CEO), to discuss Citrix's recent performance. Cohn indicated that he would be sending a letter to the Board recommending that Citrix initiate a strategic review process.

42.     On August 25, 2021, Elliott sent a letter to the Board recommending that Citrix engage with Elliott and other potentially interested parties regarding a "take-private" transaction ("August 25 Elliott Letter"). The August 25 Elliott Letter advised that Elliott had made an investment of approximately $1.3 billion in Citrix in the form of common stock and derivatives, which provided Elliott with aggregate economic exposure comparable to an interest in approximately 10% of the Company's common stock. The August 25 Elliott Letter further contended that Citrix had "missed expectations" with regard to its cloud transition. This gratuitous criticism was plainly unfounded since, as shown above, Citrix was making enormous progress transitioning to cloud-based solutions with enormous growth in SaaS ARR in 2021.

43.     On September 2, 2021, after receiving the August 25 Elliott Letter, the Board retained Qatalyst to contact other potential buyers consisting of three strategic buyers and nine financial sponsors, including Vista. The same day, Board also discussed past and current business relationships that certain directors had with Elliott, Vista and other potential participants in a strategic process, and reached certain conclusions, which the Preliminary Proxy describes as follows:

***Moira J. Kilcoyne was currently a director of Elliott Opportunity II Corp., a special purpose acquisition company sponsored by an affiliate of Elliott,*** and Thomas E. Hogan was currently a Managing Director of Vista, which was among the financial sponsors that the Citrix Board determined to potentially contact in connection with the strategic process given Vista's investment focus in enterprise software, data and technologyenabled organizations and in light of Vista's prior ownership of Wrike. ***It was determined that, given Ms. Kilcoyne's current relationship with an Elliott affiliate and Mr. Hogan's current relationship with Vista and the potential conflicts or the appearance of potential conflicts that could arise as a result of these relationships, Ms. Kilcoyne and Mr. Hogan would recuse themselves from further Board meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or alternatives thereto.*** As a result, Ms. Kilcoyne and Mr. Hogan (who were not in attendance for any portion of this meeting related to the strategic process) did not participate in further Board or committee meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or any alternatives thereto.

In addition, the Citrix Board discussed ***certain past relationships identified by the directors, including the past service of Mr. Cohn on the Citrix Board which overlapped with certain of Citrix's current directors,*** the past service of Mr. Cohn on the Board of Directors of LogMeIn, Inc. (the company that acquired Citrix's GoTo family of service offerings) which overlapped with certain of Citrix's current directors, ***and a prior consulting relationship between Mr. Calderoni and Elliott that had concluded in July 2019. It also was noted that a family member of Mr. Calderoni works for Elliott in a non-investment, administrative role.*** The Citrix Board determined that these relationships did not present a conflict with respect to the consideration of a potential strategic transaction with Elliott or any alternatives thereto.

44.    The above description of the Board's deliberations concerning conflicts fails to fully disclose Defendant Calderoni's more extensive past working relationship with Elliott, including (as described above) Defendant Calderoni's close working relationship with Cohn on the Citrix Operations Committee beginning in June 2015 (as evidenced by Defendant Calderoni's comments quoted in the April 2020 press release announcing Cohn's departure from the Board), and Defendant Calderoni's prior working relationship with Elliott after Elliott acquired substantial stakes in Juniper (where Defendant Calderoni was a board member) and EMC (where Defendant Calderoni advised the private equity firm that ultimately acquired EMC with Dell).

45.    Despite these past relationships (which the Board ignored), Defendant Calderoni

did not recuse himself from further Board meetings or deliberations regarding a potential transaction with Elliott. To the contrary, aside from Defendant Calderoni remaining Chairman of the Board, the Board announced on October 6, 2021, that it had appointed Defendant Calderoni Interim CEO and President of Citrix. In that capacity, Defendant Calderoni concededly had "conversations" with Elliott during Citrix's evaluation of potential strategic alternatives. While the Preliminary Proxy contends that these discussions did not concern "the specific terms of a potential strategic transaction," the Preliminary Proxy inconsistently shares elsewhere that Defendant Calderoni (i) "had a call with representatives of Financial Sponsor F to discuss their partnering with Elliott;" (ii) updated the Transaction Committee (as defined below) concerning "the strategic process, including the recent interactions with Elliott and Financial Sponsor F;" (iii) "had a call with the Chief Executive Officer of Strategic Buyer B regarding the possibility of a merger between Strategic Buyer B and Citrix," during which call Defendant Calderoni "indicated that the Company was open to engaging in further discussions if Strategic Buyer B were able to submit a proposal with a significant cash component and a meaningful premium to Citrix's unaffected stock price;" and (iv) spoke with Cohn on January 28, 2022 to confirm Elliott's best and final offer and "related considerations" prior to the Transaction Committee's approval of the deal with Elliott and Vista. It appears Defendant Calderoni may have also participated in discussions with Elliott and Vista concerning the projections that Qatalyst used to prepare its Fairness Opinion (as defined below).

46.     On September 9, 2021, Elliott submitted a written, non-binding indication of interest proposing to acquire all of the outstanding shares of Citrix for $124.00 to $130.00 per share in cash, subject to due diligence and the negotiation of a definitive agreement.

47.     On October 18, 2021, Elliott submitted a revised written, non-binding indication of

interest with respect to acquiring all of the outstanding shares of Citrix for $125.00 per share in cash, subject to the completion of due diligence and the negotiation of a definitive agreement (the "October 18 Proposal").

48.     On October 21, 2021, the Board formed a Transaction Committee of purportedly independent and disinterested directors to (i) monitor and direct the process and procedures related to the review and evaluation of the October 18 Proposal and any other proposals that the Company might receive with respect to a strategic transaction, as well as other potential strategic alternatives that may be available to enhance shareholder value (including continuing to operate as an independent company), and (ii) make a recommendation to the Board regarding the advisability of any such transaction or other alternatives. The Transaction Committee consisted of Defendants Caldwell, Demo, Knowling, Sacripanti and Sherman.

49.     On November 19, 2021, Qatalyst authorized Elliott to work with Vista, and on December 5, 2021, Vista and Elliott submitted a written, non-binding indication of interest proposing to acquire all of the outstanding shares of Citrix for $110.00 per share in cash, subject to the completion of due diligence and the negotiation of a definitive agreement (the "December 5 Proposal").

50.     On December 7, 2021, the Transaction Committee met with senior management and its financial and legal advisors to review financial projections prepared by senior management for use in the strategic process for the remainder of fiscal year 2021 and fiscal years 2022 through 2026 ("December Projections"). During the meeting, senior management reviewed with the Transaction Committee the related methodology, underlying assumptions, and potential opportunities and risks in achieving the December Projections, and the Transaction Committee purported to consider the execution challenges that Citrix is facing, the risks associated with

14

Citrix's business model transition, and market dynamics. Following these discussions, the Transaction Committee approved the December Projections for use by Qatalyst in preparing its fairness opinion ("Fairness Opinion"). In discussing the December Projections, however, senior management and the Transaction Committee and its advisors failed to consider Citrix's strong progress in 2021 transitioning to a cloud-based model, as evidenced by the substantial growth in various ARR metrics, as described in the Q1 2021, Q2 2021, and Q3 2021 Letters quoted above.

51.     On December 28, 2021, the Transaction Committee authorized Qatalyst to make a counteroffer to Elliott and Vista of $120.00 per share in cash. After Elliott and Vista rejected raising their bid above $110.00 per share in cash, Qatalyst asked Eliott and Vista to raise their bid by $2.00 per share in cash.

52.     Elliott and Vista not only rejected the requested increase, but on January 28, 2022, reduced their bid further to $103.51 per share in cash, which they justified based on purportedly more expensive financing terms. Cohn advised Defendant Calderoni that this was the best and final offer. The Transaction Committee subsequently asked Elliott and Vista to increase their bid to $104.00 per share in cash, and Elliott and Vista agreed.

53.     On January 30, 2022, Qatalyst orally presented (and later committed to writing) its Fairness Opinion concluding that the $104.00 per share in cash to be paid by Elliott and Vista was fair, from a financial point of view, to Citrix Stockholders.

54.     Following the oral presentation of the Fairness Opinion, the Transaction Committee unanimously recommended that the Board (i) declare that the Merger was in the best interests of Citrix Stockholders; (ii) approve the Merger; and (iii) recommend approval of the Merger by Citrix Stockholders. The Board (excluding Defendants Kilcoyne and Hogan but including Defendant Calderoni) accepted the Transaction Committee's recommendation, and on January 31, 2022,

Citrix, Elliott and Vista executed a Merger Agreement.

55.     On January 31, 2022, Citrix, Elliott and Vista issued a joint press release announcing the Merger.

**Receipt of Different Consideration by Officers and Directors**

56.     The Preliminary Proxy acknowledges that "Citrix's non-employee directors and executive officers have interests in the Merger that may be different from, or in addition to, the interests of Citrix stockholders generally."

57.     The Preliminary Proxy contained the following tables showing the amount of cash that Citrix's executive officers and non-employee directors who are named Defendants herein can expect to receive for their Citrix RSU awards, Citrix PRSU awards, and Citrix DSU awards, assuming continued employment/service through both the (1) closing date of the Merger and (2) earliest of any remaining vesting dates or an earlier qualifying termination:

**Cash Payments to Executive Officers and Non-Employee Directors in Respect of Citrix RSUs**

| Name | No. of Citrix RSUs | Consideration ($)(1) |
|------|------|------|
| **Executive Officers:** | | |
| Robert M. Calderoni | 105,966 | 11,020,464 |
| Michael Arenth | 62,770 | 6,528,080 |
| Antonio G. Gomes | 22,599 | 2,350,296 |
| David J. Henshall (2) | — | — |
| Paul J. Hough | 22,340 | 2,323,360 |
| Woong Joseph Kim | 77,302 | 8,039,408 |
| Donna N. Kimmel | 20,146 | 2,095,184 |
| Hector Lima | 29,387 | 3,056,248 |
| Timothy A. Minahan | 20,146 | 2,095,184 |
| Mark J. Schmitz | 38,284 | 3,981,536 |
| Arlen R. Shenkman | 42,130 | 4,381,520 |
| Jason Smith | 34,209 | 3,557,736 |
| **Non-Employee Directors:** | | |
| Nanci E. Caldwell | 2,144 | 222,976 |
| Murray J. Demo | 2,144 | 222,976 |
| Thomas E. Hogan | 2,144 | 222,976 |
| Moira A. Kilcoyne | 2,144 | 222,976 |
| Robert E. Knowling, Jr. | — | — |
| Peter J. Sacripanti | 2,144 | 222,976 |
| J. Donald Sherman | 2,144 | 222,976 |

**Cash Payments to Executive Officers and Non-Employee Directors in Respect of Citrix DSUs (Vested and Unvested)**

| Name | No. of Citrix DSUs(1) | Consideration ($)(2) |
|------|------|------|
| **Executive Officers:** | | |
| Robert M. Calderoni | 17,685 | 1,839,240 |
| David J. Henshall(3) | 50,066 | 5,206,864 |
| **Non-Employee Directors:** | | |
| Nanci E. Caldwell | 32,496 | 3,379,584 |
| Murray J. Demo | — | — |
| Thomas E. Hogan | — | — |
| Moira A. Kilcoyne | — | — |
| Robert E. Knowling, Jr. | 3,502 | 364,208 |
| Peter J. Sacripanti | 12,278 | 1,276,912 |
| J. Donald Sherman | — | — |

58.     In particular, according to the Preliminary Proxy, Defendant Calderoni will be eligible to receive a total of $20,248,022 in potential payments in connection with completion of the Merger, comprised of the equity awards described above, plus cash and other benefits:

**Potential Payments to Named Executive Officers**

| Named Executive Officer | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(1) | Total ($) |
|------|------|------|------|------|
| Robert M. Calderoni | 7,314,041 | 12,859,704 | 74,277 | 20,248,022 |
| David J. Henshall | 8,750,000(3) | 8,977,696(4) | — | 17,727,696 |
| Arlen R. Shenkman | 1,800,000 | 12,166,232 | 82,514 | 14,048,746 |
| Antonio G. Gomes | 1,496,250 | 8,864,648 | 83,539 | 10,444,437 |
| Paul J. Hough | 1,496,250 | 8,739,744 | 83,539 | 10,319,533 |
| Woong Joseph Kim | 1,800,000 | 11,316,760 | 57,688 | 13,174,448 |

59.     Additionally, the Preliminary Proxy discloses that Defendant Calderoni currently beneficially owns or has a pecuniary interest in 117,419 Citrix shares, which appears to include

approximately 70,000 shares of Citrix stock owned outright or held in an affiliated trust (after excluding RSU's and DSU's already accounted for in the tables above). Such additional shares will result in the payment of additional cash to Defendant Calderoni (and an affiliated trust) of approximately $7.3 million upon consummation of the Merger, for total cash payments to Defendant Calderoni in excess of $27 million.

**The Preliminary Proxy Contains Material Misrepresentations and Omissions**

60.     Defendants disseminated a false and misleading Preliminary Proxy to Citrix's stockholders that misrepresents or omits material information that is necessary for Citrix stockholders to make an informed decision concerning whether to vote for the Merger.

***Material Omissions Concerning Conflicts Between Defendant Calderoni and Elliott***

61.     As noted above, on September 2, 2021, the Board purported to discuss past and current business relationships that certain directors had with Elliott, Vista and other potential participants in the strategic process, in order to determine whether any of those relationships presented a conflict with respect to the consideration of a transaction with Elliott or any alternatives thereto.

62.     With respect to Defendant Calderoni, the Preliminary Proxy discloses only (i) "past service of Mr. Cohn on the Citrix Board which overlapped with certain of Citrix's current directors" (which would include Defendant Calderoni among others); (ii) "a prior consulting relationship between Mr. Calderoni and Elliott that had concluded in July 2019;" and (iii) "a family member of Mr. Calderoni works for Elliott in a non-investment, administrative role." These statements omit material facts that are necessary to make them not misleading.

63. First, the Preliminary Proxy fails to disclose the duration of the prior consulting relationship between Elliott and Defendant Calderoni that ended in July 2019, and the amount of compensation that Elliott paid to Defendant Calderoni in connection with that relationship.

64. Second, the Preliminary Proxy fails to disclose that the prior business relationships between Defendant Calderoni and Elliott were much more extensive than revealed in the Preliminary Proxy. In particular, Defendant Calderoni (i) worked closely with Cohn on the Operations Committee formed by the Board in July 2015 to improve Citrix's operations, and upon Cohn's departure from the Board in April 2020, fulsomely thanked Cohn for his valuable "candor, insights and partnership" and "many contributions" as Citrix executed a significant shift in its strategy, operations and business model; (ii) previously served as a director of Juniper where he worked with Elliott after Elliott reached an agreement with Juniper in February 2014 to obtain two seats on Juniper's board of directors and implement a plan to improve operations; and (iii) previously served as a senior advisor to Silver Lake Partners, a private equity firm that announced in October 2015 it would participate in the $67 billion purchase by Dell Computers of EMC Corp., in which Elliott held a 2.2% stake and which Elliott had been pressuring since October 2014 to spin off assets.

65. As discussed above, in his capacity as Chairman of the Board, and Interim CEO and President, Defendant Calderoni was actively involved in the strategic review process, including having "conversations" with Elliott and other potential bidders. Therefore, any conflicts that could predispose a key fiduciary like Defendant Calderoni to favor Elliott during the bidding process is a material fact that reasonable Citrix stockholders would deem important to know in determining whether to vote for the Merger. As such, in advance of the Stockholder Vote, Citrix stockholders are entitled to complete and accurate disclosures regarding all prior business

relationships between Defendant Calderoni and Elliott, and the amount of any compensation paid by Elliott to Defendant Calderoni in connection with those relationships.

***False and Misleading Statements and Material Omissions Concerning "Conversations" Between Defendant Calderoni and Elliott and Other Bidders***

66.     Given the conflict presented by Defendant Calderoni's extensive prior relationships with Elliott—and the fact that Defendant Calderoni stands to receive over $27 million in cash upon consummation of the Merger—it was vital for the Preliminary Proxy to fully and accurately disclose Defendant Calderoni's role in the negotiation and approval of the Merger. Yet, the Preliminary Proxy contains false and misleading statements and material omissions with respect to the role played by Defendant Calderoni in the strategic review process.

67.     On the one hand, the Preliminary Proxy states that "throughout Citrix's evaluation of potential strategic alternatives, Mr. Calderoni and other members of senior management had conversations with representatives of the various potential acquirers and financial sponsors, including Elliott and Vista," but that "[n]o member of senior management made any proposals or otherwise discussed the specific terms of a potential strategic transaction during any meetings or conversations with any potential acquirers or financial sponsors . . ." Yet, inconsistent with that representation, the Preliminary Proxy elsewhere states that that Defendant Calderoni (i) "had a call with representatives of Financial Sponsor F to discuss their partnering with Elliott;" (ii) updated the Transaction Committee (as defined below) concerning "the strategic process, including the recent interactions with Elliott and Financial Sponsor F;" (iii) "had a call with the Chief Executive Officer of Strategic Buyer B regarding the possibility of a merger between Strategic Buyer B and Citrix," during which call Defendant Calderoni "indicated that the Company was open to engaging in further discussions if Strategic Buyer B were able to submit a proposal with a significant cash component and a meaningful premium to Citrix's unaffected stock price;" and (iv) spoke with

Cohn on January 28, 2022 to confirm Elliott's best and final offer and "related considerations" prior to the Transaction Committee's approval of the deal with Elliott and Vista.

68.     Given the over $27 million in cash payments that Defendant Calderoni stands to receive upon consummation of the Merger, and Defendant Calderoni's extensive prior business relationships with Elliott, the contents of any conversations between Defendant Calderoni and Elliott, Vista, and any other potential acquirers or financial sponsors during the bidding process concerning price and other material terms of a transaction are material facts that reasonable Citrix stockholders would deem important to know in determining whether to vote for the Merger. As such, in advance of the Stockholder Vote, Citrix stockholders are entitled to complete and accurate disclosures regarding the contents of any conversations between Defendant Calderoni and Elliott, Vista, and any other potential acquirers or financial sponsors during the bidding process concerning price and other material terms of a transaction.

***Material Omissions Concerning the Enormous Growth in SaaS ARR
During The First Three Quarters of 2021***

69.     The Preliminary Proxy states that on "April 29, 2021, Citrix announced its results of operations for the first quarter of fiscal year 2021, which included reported revenue below expectations. The Company noted that its results reflected supply chain challenges for certain components used in its networking products, which led to hardware shipment delays, and lower than anticipated on-premises term average contract duration." This unduly negative characterization of Citrix's Q1 2021 results omits material facts that are necessary to make the statement not misleading. Specifically, in the Q1 2021 Letter, Henshall wrote that "[o]ur first quarter results reflect ***accelerated momentum in our cloud transition*** with more of our installed base moving to the cloud, driving an increased mix shift towards SaaS and acceleration of SaaS

ARR," *including total SaaS ARR of $943 million, up 70% year-over-year* (inclusive of Wrike). The Preliminary Proxy makes no mention of these highly positive developments in Q1 2021.

70.     The Preliminary Proxy further states that on "July 29, 2021, Citrix announced its results of operations for the second quarter of fiscal year 2021, which again included reported revenue below expectations, noting the difficulties associated with transitioning the business to a SaaS model and the need to evolve the Company's sales strategy to deliver more predictable results." This unduly negative characterization of Citrix's Q2 2021 results omits material facts that are necessary to make the statement not misleading. Specifically, in the Q2 2021 Letter, Henshall wrote that despite revenue challenges, "[o]ur second quarter results reflect continued positive momentum in our business model transition with *accelerating SaaS ARR*, *strong growth in Citrix Cloud Paid Subscribers* and *a higher-than-expected mix of SaaS bookings as a percentage of total subscription bookings*." In particular, Henshall noted that SaaS ARR had grown enormously to more than $1 billion, up 74% year-over-year (inclusive of Wrike). He added that "*we continue to believe that SaaS ARR is <u>the best way</u> to measure the progress we are making in transitioning our business to the cloud*." The Preliminary Proxy makes no mention of these highly positive developments in Q2 2021.

71.     The Preliminary Proxy further states that "[o]n November 4, 2021, Citrix reported its results of operations for the third quarter of 2021 and moderated its fourth quarter revenue expectations, noting that the Company had underperformed its expectations during the year as it continued to face execution challenges." This unduly negative characterization of Citrix's Q3 2021 results omits material facts that are necessary to make the statement not misleading. Specifically, in the Q3 2021 Letter, Defendant Calderoni wrote that "*[i]n the third quarter of 2021, Citrix made significant progress on its transition to the cloud*," including SaaS ARR of $1.1 billion, *up 75%*

*year-over-year* (including Wrike). He added that "[w]e believe Total ARR is *the **best metric** to measure the underlying health of our business*."

72.     Indeed, in the Q3 2021 Letter, Defendant Calderoni was particularly optimistic about future growth in SaaS ARR, stating that "[d]espite achieving more than $1 billion in SaaS ARR in the third quarter of 2021, *we are still in the early innings of our cloud transition* with less than 15% of our current installed base having transitioned to cloud products. This continues to represent *an enormous opportunity and provides a strong tailwind to support our SaaS ARR growth for years*." Defendant Calderoni also reassured Citrix Stockholders that "*the revenue headwinds from declining perpetual licenses are now largely behind us* in our Workspace business as we reach the anniversary of the end of broad availability of perpetual Citrix Workspace licenses." Thus, Defendant Calderoni and other senior Citrix executives understood that reporting revenue below expectations was not a sign of poor performance, but part of a deliberate strategy that was proceeding smoothly to transition to more lucrative and predictable SaaS-based revenue.

73.     Further, when the Preliminary Proxy recites the "negative factors" weighing *against* the Merger that the Board and the Transaction Committee considered, there is also zero mention of the fact that Citrix made enormous progress in 2021 in transitioning to a cloud-based business, and that Citrix experienced enormous growth in SaaS ARR during 2021.

74.     In sum, despite (i) Citrix's enormous progress in 2021 in transitioning customers to cloud-based solutions, and Citrix's substantial 70%+ growth in SaaS ARR during 2021 to more than $3 billion in the first three quarters (and likely another $1 billion in Q4 2021), and (ii) Henshall and Defendant Calderoni both publicly opining that ARR is the best metric to measure the health and progress of Citrix's business, the enormous growth in SaaS ARR in 2021 is never mentioned anywhere in the Preliminary Proxy (despite the acknowledgement noted above that

Citrix's strategy is to transition to cloud-based solutions). This glaring omission misleads Citrix Stockholders by presenting them with an excessively gloomy picture of Citrix's prospects, in sharp contrast to the Q1 2021, Q2 2021, and Q3 2021 Letters, which paint a bright picture of Citrix's future as it successfully transitions to cloud-based solutions and rapidly grows SaaS ARR.

75.    The omission of Citrix's enormous growth in SaaS ARR in 2021 from the Preliminary Proxy is particularly glaring in light of the Board's agreement in January 2021 to pay $2.25 billion to Vista to acquire Wrike based on its anticipated 30% growth in SaaS ARR in 2021 to $180-$190 million—a multiple of 12.1x *anticipated* SaaS ARR. With Citrix having acquired Wrike just over a year ago based on strong SaaS ARR growth, a reasonable Citrix stockholder deciding whether to approve the Merger would deem it important to know that (i) Citrix itself experienced substantial 70%+ growth in SaaS ARR to more than $3 billion during the first three quarters 2021 (plus another $1 billion likely in Q4 2021), and (ii) Henshall and Defendant Calderoni had both publicly opined that SaaS ARR growth is the best metric to measure the success of Citrix.

76.    It appears the Preliminary Proxy did not disclose those material facts precisely because doing so would raise uncomfortable questions concerning why the Board agreed to approve a deal for Elliott and Vista to acquire Citrix for only $16.5 billion (including the assumption of Citrix debt)—a multiple of only 4.1x Citrix's *trailing* SaaS ARR in 2021—after the *same* Board agreed to acquire Wrike from Vista for $2.25 billion—a multiple of 12.1x Wrike's *anticipated* SaaS ARR in 2021.

***The December Projections in the Preliminary Proxy Were Subjectively and Objectively False Statements of Opinion***

77.    As noted, in the Q2 2021 Letter, Henshall stated that "***we continue to believe*** that SaaS ARR is the ***best way*** to measure the progress we are making in transitioning our business to

the cloud," while in the Q3 2021 Letter, Defendant Calderoni stated that "*[w]e believe* Total ARR is the *best metric* to measure the underlying health of our business." Yet, despite the publicly professed belief of Henshall and Defendant Calderoni in ARR as the best metric to measure Citrix's success, and the representation in the Preliminary Proxy that the December Projections reflected the "*actual* results for the third quarter of fiscal years 2021," Citrix's senior management and the Transaction Committee considered only "the *execution challenges* that Citrix is facing, *the risks* associated with Citrix's business model transition, and market dynamics" in preparing the December Projections. Citrix's senior management and the Transaction Committee did not, however, purport to consider the enormous growth in SaaS ARR, and Citrix's significant progress in transitioning its customers to the cloud, in Q3 2021 (as reflected in Defendant Calderoni's 3Q 2021 Letter), when preparing the December Projections.

78.     Additionally, Qatalyst further depressed the December Projections by presenting more pessimistic sensitivity scenarios to the Transaction Committee reflecting "*lower revenue growth rates and operating margins*," purportedly to "allow the Transaction Committee to consider the December Projections in light of the execution challenges facing the Company." No sensitivity analysis was performed, however, to illustrate the potential upside to the December Projections from continued strong progress in transitioning to cloud-based solutions, and continued enormous growth in SaaS ARR.

79.     Given the failure of senior management to consider Citrix's enormous progress in transitioning to cloud-based solutions, and enormous growth in SaaS ARR during 2021, when formulating the December Projections—even though both Henshall and Defendant Calderoni both publicly opined that ARR growth is the most important measure of the health and progress of Citrix's business—it is clear that neither the December Projections nor the sensitivity scenarios

created by Qatalyst, reflected the legitimately held opinion of senior Citrix management regarding Citrix's prospects. Instead, it is plain that (i) the optimistic statements concerning SaaS ARR growth shared by Henshall in the Q1 2021 Letter and Q2 2021 Letter, and Defendant Calderoni in the Q3 2021 Letter, represented the legitimately held opinion of Citrix management concerning the future prospects for Citrix, and (ii) the unduly pessimistic December Projections and related sensitivity scenarios were created solely for the improper purpose of engineering a DCF Analysis that would allow Qatalyst to conclude that the Merger Consideration was fair to Citrix stockholders. In sum, because Citrix management did not genuinely and honestly believe the December Projections and related sensitivity analyses were accurate, such projections and analyses are subjectively false.

80.     The December Projections and related sensitivity analyses are also objectively false because they ignored what Henshall and Defendant Calderoni opined was the most important metric in measuring the health and progress of Citrix business (i.e., growth in ARR), and instead relied on unreasonably pessimistic and inaccurate assumptions. In developing the December Projections and related sensitivity analyses, Citrix management and Qatalyst plainly ignored all positive developments (such as enormous growth in SaaS ARR) in order to generate more pessimistic projections for the sole purpose of ensuring a DCF Analysis that would allow Qatalyst to conclude the Merger Consideration was fair.

81.     Defendants harbored an incentive to create false projections and thereby make the Merger Consideration appear fair because they stand to reap millions from their stock, equity awards and other contractual severance rights upon consummation of the Merger (see tables above). In particular, Defendant Calderoni's huge payday of over $27 million upon consummation of the Merger depended on Qatalyst's Fairness Opinion concluding that the Merger Consideration

was fair to Citrix stockholders. Therefore, when providing business updates to the Transaction Committee throughout the bidding process, and working with other members of senior management to prepare the projections approved by the Transaction Committee and used by Qatalyst to prepare the Fairness Opinion, Defendant Calderoni had a strong motive to (i) present pessimistic projections, and emphasize negative factors, that would ensure Qatalyst's Fairness Opinion concluded the Merger Consideration was fair, and (ii) ignore his prior public statements opining that "*we are still in the early innings of our cloud transition* with less than 15% of our current installed base having transitioned to cloud products," "[cloud transition] continues to represent *an enormous opportunity and provides a strong tailwind* to support our SaaS ARR growth for years," "[t]otal ARR is *the best metric* to measure the underlying health of our business," and "[o]ver time, as we emerge from our cloud transition, *we would expect to see reported revenues grow more in line with Total ARR*."

### *The Qatalyst Fairness Opinion Was False and Misleading*

82.     Since the DCF Analysis performed by Qatalyst and incorporated into the Qatalyst Fairness Opinion was based on the December Projections, and the December Projections are subjectively and objectively false, the Qatalyst Fairness Opinion was also false and misleading to the extent it used the false and misleading December Projections to calculate value per share ranges under the DCF Analysis. Had the DCF Analysis used reasonable and accurate projections that Citrix management genuinely believed, the value per share ranges derived from the DCF Analysis would have been higher and indicated that the Merger Consideration was not fair.

83.     Beyond its reliance on the false and misleading December Projections, the Qatalyst Fairness Opinion included in the Preliminary Proxy, also improperly fails to disclose certain key inputs and assumptions underlying the analyses on which it was based, which further renders it

false and misleading. Without this information, as described below, Citrix Stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Fairness Opinion in determining whether to vote for the Merger. This omitted information, if disclosed, would significantly alter the total mix of information

84.     With respect to Qatalyst's *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to adequately disclose how Qatalyst determined that a discount rate range of 8.0% to 9.5% was appropriate. The explanation that the discount rate range is "based on an estimated average cost of capital for Citrix" is woefully insufficient.

85.     Notably, a DCF analysis performed by online research firm Simply Wall Street uses a discount rate of 6.77% (based on a fully disclosed methodology) to value Citrix:

## Share Price vs. Fair Value

Below are the data sources, inputs and calculation used to determine the intrinsic value for Citrix Systems.

| Data Point | Source | Value |
|---|---|---|
| Valuation Model | | 2 Stage Free Cash Flow to Equity |
| Levered Free Cash Flow | Average of 9 Analyst Estimates (S&P Global) | See below |
| Discount Rate (Cost of Equity) | See below | 6.8% |
| Perpetual Growth Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |

| Data Point | Calculation/ Source | Result |
|---|---|---|
| Risk-Free Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |
| Equity Risk Premium | S&P Global | 4.2% |
| Software Unlevered Beta | Simply Wall St/ S&P Global | 0.99 |
| Re-levered Beta | = 0.33 + [(0.66 * Unlevered beta) * (1 + (1 - tax rate) (Debt/Market Equity))]<br>= 0.33 + [(0.66 * 0.994) * (1 + (1 - 21.0%) (27.99%))] | 1.143 |
| Levered Beta | Levered Beta limited to 0.8 to 2.0 (practical range for a stable firm) | 1.143 |
| Discount Rate/ Cost of Equity | = Cost of Equity = Risk Free Rate + (Levered Beta * Equity Risk Premium)<br>= 1.92% + (1.143 * 4.24%) | 6.77% |

86.     The higher discount rate of 8.0% to 9.5% used by Qatalyst (according to an undisclosed methodology) depressed the value range for Citrix's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). Citrix Stockholders are entitled to further disclosure on how Qatalyst derived its excessively high discount rate range. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them.").

87.     With respect to Qatalyst's *Selected Transactions Analysis*, Qatalyst failed to include Citrix's purchase of Wrike from Vista in January 2021. As noted, Citrix acquired Wrike from Vista for $2.25 billion when Wrike was projected to grow its SaaS ARR by 30 percent to between $180 million and $190 million in 2021, yielding a multiple of 12.1x expected annual SaaS recurring revenue. That omission was likely intentional since it indicates that selling Citrix to Elliott and Vista for only $16.5 billion (including the assumption of Citrix debt)—a multiple of only 4.1x Citrix's *trailing* SaaS ARR in 2021—is highly unfair and inadequate.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants
for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

88.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

89.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Preliminary Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under

which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

90.     Defendants disseminated the false and misleading Preliminary Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

91.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Preliminary Proxy, Defendants were aware of their duty not to make false and misleading statements in the Preliminary Proxy, and not to omit material facts from the Preliminary Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

92.     Yet, as specified in paragraphs 60-87 above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Preliminary Proxy, and (ii) omitted material facts from the Preliminary Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Citrix stockholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Preliminary Proxy with these material misrepresentations and omissions.

93.     The material misrepresentations and omissions in the Preliminary Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Citrix stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Citrix stockholder would view disclosures of the omitted facts

specified above as significantly altering the "total mix" of information made available to Citrix stockholders.

94.     Because of the material misrepresentations and omissions in the Preliminary Proxy specified above, Plaintiff and other Citrix stockholders are threatened with irreparable harm insofar as Plaintiff and other Citrix stockholders will be deprived of their entitlement to make a fully informed decision as to how to vote on the Merger and related proposals if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

95.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

96.     The Individual Defendants acted as controlling persons of Citrix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Citrix, and participation in, and/or awareness of Citrix's operations, and/or intimate knowledge of the contents of the Preliminary Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Citrix with respect to the Preliminary Proxy, including the content and dissemination of the various statements in the Preliminary Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

97.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Preliminary Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

98.     Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Citrix, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Preliminary Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Citrix stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Preliminary Proxy.

99.     In addition, as the Preliminary Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger. The Preliminary Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Preliminary Proxy.

100.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

101.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

102.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

Defendants' actions threaten to inflict, and can Plaintiff and other Citrix stockholders make an informed decision about whether to vote for the Merger.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Citrix stockholders the material information specified above that has been omitted from the Preliminary Proxy, and correct any false and misleading statements in the Preliminary Proxy;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages.

C.      Directing Defendant to account to Plaintiff for all damages suffered as a result of their misconduct.

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: March 14, 2022                    **WOHL & FRUCHTER LLP**


                                          By:/s *Joshua E. Fruchter*
                                          Joshua E. Fruchter (JF2970)
                                          25 Robert Pitt Drive, Suite 209G
                                          Monsey, NY 10952
                                          Tel: (845) 290-6818
                                          Fax: (718) 504-3773
                                          Email: jfruchter@wohlfruchter.com

                                          *Attorneys for Plaintiff*